1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JOHN ABEL,                              No.  2:11-cv-0721 GEB AC P

12                    Petitioner,

13          v.                                FINDINGS AND RECOMMENDATIONS

14    FRANK X. CHAVEZ, Warden,

15                    Respondent.

16

17          Petitioner is a California state prisoner proceeding with counsel pursuant to 28 U.S.C. §

18    2254.  The action proceeds on the petition for writ of habeas corpus filed on March 16, 2011.

19    ECF No. 1.  Respondent has filed answer, ECF No. 19, and petitioner has filed a traverse, ECF

20    No. 22.  Petitioner seeks relief on grounds involving the use of evidence regarding online

21    pornography at his trial for child sexual abuse.

22                     FACTUAL AND PROCEDURAL BACKGROUND

23          Petitioner divorced in 1999.  On August 26, 2003 he was charged in Solano County

24    Superior Court with the continuing sexual abuse of his two children.  The charges were dismissed

25    on August 25, 2004, because the prosecutor had been unable to obtain evidence related to

26    petitioner's alleged online involvement with child pornography.  The charges were re-filed on

27    July 14, 2005.  Prior to trial, the defense moved to exclude evidence about use of child

28    pornography websites, and sought a pretrial hearing on admissibility pursuant to Cal. Evid. Code

                                          1

1   section 402.  The court did conduct a section 402 hearing, but only after a jury had been selected.

2   The court rejected the defense contention that, if the evidence was to be admitted, prospective

3   jurors should be questioned about their attitudes toward internet child pornography and people

4   who view it.  At the conclusion of the section 402 hearing, the evidence was ruled admissible.

5         The prosecution presented the following evidence at trial.  Abel and his former wife,

6   Heather Lee, divorced when their daughter E.A. was three and their son J.A. was seven.  They

7   shared custody on a 50-50 basis.  Ms. Lee lived with her parents after the divorce.  The children's

8   maternal grandfather testified that when E.A. was about five years old, she began hesitating about

9   going to her father's apartment.  Over the course of about a year, she became increasingly

10  distressed about leaving her mother's home to spend time with her father.  The last time E.A. was

11  picked up by her father she became hysterical and had to be carried to petitioner's car.

12        Ms. Lee testified that before the divorce, when J.A. was about three, he told her that

13  petitioner had touched his privates.  Petitioner denied any inappropriate contact, and Ms. Lee let it

14  go.  Shortly after the divorce, J.A. again reported that his father was touching his private parts.

15  Again petitioner denied it, and again Ms. Lee "left it alone."  J.A. became very upset when his

16  mother questioned him about it later, and insisted that nothing had happened.  A few years later,

17  in August 2003, six year old E.A. reported a rash in her genital area.  In response to Ms. Lee's

18  questioning, E.A. reported that "Daddy touched me down there."  Ms. Lee called Child Protective

19  Services.  When she later explained to J.A. why she was taking E.A. for an interview, J.A.

20  became upset and told his mother that E.A. was lying.  Later that night he told his mother that

21  "[E.A.] is not lying because daddy touches me too."

22        E.A. was 11 years old when she testified.  She said that her father had first touched her

23  "privates" when she was between three and five years old.  One night at his apartment she had a

24  nightmare and went into her father's bed.  She woke to him touching her vagina.  He put his

25  finger inside her and "moved it up and down."  Petitioner encouraged her to touch his private

26  parts, but she did not do so because she thought it was "gross."  E.A. was six or seven years old

27  the last time the unwanted touching occurred.  On that day she had baked cookies at her father's

28  apartment.  She was sitting on his lap, and he put his hand in her pants.  She told him to stop, and

told her mother the next day.  Her father touched her vagina between five and ten occasions altogether.  He always touched the inside of her vagina.  He told E.A. to keep it a secret.

J.A. was 15 when he testified.  He thought that petitioner started touching him when he was about two years old, but didn't remember the early incidents.  He had told his mother but nothing happened.  When he was six years old, his father took him into the bedroom and pulled down his pants and underpants.  Petitioner fondled J.A's penis and put his mouth on it.  Petitioner also had J.A. touch petitioner's penis with an "up and down motion."  J.A. put his mouth on petitioner's penis, and something white came out.  Petitioner made J.A. touch petitioner's penis on many occasions, and "paid" J.A. by crediting small amounts of money ($5 or $10) to an "account" petitioner kept on his computer.  On one occasion petitioner took photographs of J.A. naked from the waist down, and put them on his computer.  On more than ten occasions he showed J.A. computer images of other naked children.  Sometimes the naked children were with naked adults.  Petitioner put his hand and mouth on J.A.'s penis whenever he showed him the pictures, and sometimes also had J.A. touch petitioner's penis.  The last incident of unwanted touching occurred when J.A. was ten years old and sleeping in his father's bed.  His father touched his penis countless times over a four year period, sometimes daily.  Petitioner told J.A. not to tell anyone.

The videotapes of the police interviews of E.A. and J.A. also were admitted into evidence and played for the jury.  J.A. had been interviewed at the ages of 11 and 13.  On both occasions he reported that his father touched his penis numerous times, including when he was sleeping in his father's bed.  On both occasions he reported that he had touched his father's penis and something came out of it.  On both occasions he said that his father had taken pictures of him and put them on the computer.  In the second interview he also said that his father had shown him pictures of other naked children on the computer.  In the second interview he reported that his father paid him $5 for "doing it."  E.A. had been interviewed at the ages of six and nine.  On both occasions she reported that her father had touched her private parts.  In the first interview she estimated that this had happened between five and ten times; in the second interview she said it happened "a couple times probably" because she "didn't let him" touch her other times.  On both

3

1    occasions she reported that her father told her she could touch his penis, but she had not done so.

2    In the first interview she reported being molested on a day that she had baked cookies at her

3    father's apartment.  In the second interview she recalled telling the detective about a cookie

4    baking day, but said "I forgot most of it."

5            Retired Vacaville police officer Ray Donaldson testified that he was present at the

6    forensic interviews of E.A. and J.A.  He also interviewed petitioner, and personally notified him

7    of the investigation.  Donaldson subsequently executed a search warrant at petitioner's home.  He

8    found a laptop and cameras, but not the two desktop computers described by witnesses.  The desk

9    in the living room was outfitted with a printer, keyboard, mouse, and computer cables, but the

10   desktop unit was missing.  Donaldson seized the laptop computer, which was discovered to

11   contain no hard drive.

12           James Ponder, a senior special agent with the Department of Homeland Security,

13   Immigrations and Customs Enforcement, testified as an expert in computer forensics.  He had

14   been the co-leader of a multinational project targeting Russian websites involving photographs of

15   children.  One site identified by Ponder's team was Sunshineboys.com, which contained

16   photographs of boys aged approximately 10 to 15 years old, "posed indoors and outdoors,

17   sometimes under clad, mostly nude in various stages of arousal."  Russian police subsequently

18   seized the servers hosting the sites, and sent images of the hard drives to the Cyber Crime Center

19   in the United States.  The team at the Cyber Crime Center forensically examined the imaged

20   drives from Russia, and extracted from them the information that a "John Patrick Abel" had

21   accessed five Web sites, including Sunshineboys.com, that contained photographs of naked or

22   partially naked boys.  The address associated with "John Patrick Abel" on the Russian servers

23   was petitioner's home address in Vacaville.  Access to the websites was paid for by credit cards

24   in petitioner's name.  A printed log indicated the specific dates in 2002 and 2003 on which

25   petitioner's credit cards were used.  The log was not introduced in evidence, but Ponder testified

26   to its contents.  Ponder agreed his knowledge was "limited to the images and the data that . . . [the

27   Cyber Crime Center] received from Russia."  He testified that information regarding the specific

28   images viewed on petitioner's computer "would not have been on the Russian server.  It would

1   have been on [Abel's] hard drive."

2         The defense theory was that the children's mother had planted the idea of sexual abuse in

3   their minds by a barrage of suggestive questioning, out of animosity toward petitioner.  On cross-

4   examination of Ms. Lee, the defense established that she had written petitioner a letter after their

5   divorce expressing the fear that he would try to take the children away from her permanently.

6   This was her "biggest fear."  Petitioner's mother and sister testified that after the divorce Ms. Lee

7   was very angry at petitioner.  Petitioner's mother, sister, and a neighbor testified that the children

8   had not acted afraid of their father.  Another sister of petitioner's testified that E.A. had rashes

9   related to inadequate wiping after toilet use.  A longtime friend of petitioner's testified about

10  petitioner's volunteer work with teenagers in a church group.  The defense presented the expert

11  testimony of forensic psychiatrist Lee Stuart Coleman, M.D.  Dr. Coleman testified regarding the

12  suggestibility of children to leading interview techniques in the sexual abuse context.

13        The jury returned a guilty verdict on March 3, 2008.  On April 15, 2008, petitioner was

14  sentenced to 24 years in prison.

15        On appeal, petitioner contended inter alia that the evidence he accessed child pornography

16  websites was improperly admitted and prejudicial.  The state conceded that the evidence was

17  admitted in error, and the court of appeal found the error harmless.  The conviction was

18  accordingly affirmed, and the California Supreme Court denied review on December 17, 2009.

19        On March 4, 2011, petitioner filed a habeas petition in the California Supreme Court.  The

20  federal petition was filed on March 16, 2011, and subsequently stayed pending exhaustion.  ECF

21  Nos. 15, 16.  The state court denied habeas relief on February 1, 2012 and federal proceedings

22  resumed shortly thereafter.  ECF Nos. 17, 18.  Respondent answered the petition on April 16,

23  2012 and petitioner filed a traverse on June 6, 2012.  ECF Nos. 19, 22.  The parties agree that the

24  federal claims are timely and exhausted.

25                    STANDARDS GOVERNING FEDERAL HABEAS REVIEW

26        28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

27  1996 ("AEDPA"), provides in relevant part as follows:

28  ////

1

2    (d) An application for a writ of habeas corpus on behalf of a person
     in custody pursuant to the judgment of a state court shall not be
3    granted with respect to any claim that was adjudicated on the merits
     in State court proceedings unless the adjudication of the claim –

4    (1) resulted in a decision that was contrary to, or involved an
     unreasonable application of, clearly established Federal law, as
5    determined by the Supreme Court of the United States; or
     (2) resulted in a decision that was based on an unreasonable
6    determination of the facts in light of the evidence presented in the
     State court proceeding.

7

8    The statute applies whenever the state court has denied a federal claim on its merits, whether or

9    not the state court explained its reasons.  Harrington v. Richter, 131 S. Ct. 770, 785 (2011).

10         The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

11   principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

12   U.S. 63, 71-72 (2003).  Clearly established federal law also includes "the legal principles and

13   standards flowing from precedent."  Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002)

14   (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)).  Only Supreme Court precedent

15   may constitute "clearly established Federal law," but circuit law has persuasive value regarding

16   what law is "clearly established" and what constitutes "unreasonable application" of that law.

17   Duchaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044,

18   1057 (9th Cir. 2004).

19         A state court decision is "contrary to" clearly established federal law if the decision

20   "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams, 529 U.S. at

21   405.  A state court decision "unreasonably applies" federal law "if the state court identifies the

22   correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the

23   particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court was incorrect

24   in the view of the federal habeas court; the state court decision must be objectively unreasonable.

25   Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).  State court decisions can be objectively

26   unreasonable when they interpret Supreme Court precedent too restrictively, when they fail to

27   give appropriate consideration and weight to the full body of available evidence, and when they

28   proceed on the basis of factual error.  See, e.g., Williams, 529 U.S. at 397-98; Wiggins, 539 U.S.

6

1   at 526-28, 534; Rompilla v. Beard, 545 U.S. 374, 388-909 (2005); Porter v. McCollum, 130 S. Ct.

2   447, 454 (2009).

3          Relief is also available under AEDPA where the state court predicated its adjudication of

4   a claim on an unreasonable factual determination.  Section 2254(d)(2).  The statute explicitly

5   limits this inquiry to the evidence that was before the state court.  An unreasonable determination

6   of facts exists where, among other circumstances, the state court made its findings according to a

7   flawed process -- for example, under an incorrect legal standard, or where necessary findings

8   were not made at all, or where the state court failed to consider and weigh relevant evidence that

9   was properly presented to it, or where petitioner was denied the opportunity to present evidence.

10  See Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir.), cert. denied, 543 U.S. 1038 (2004).  A

11  factual conclusion can also be substantively unreasonable where it is not fairly supported by the

12  evidence presented in the state proceeding.  See, e.g., Wiggins, 539 U.S. at 528 (state court's

13  "clear factual error" regarding contents of social service records constituted unreasonable

14  determination of fact).

15         To prevail, a habeas petitioner must establish the applicability of one of the § 2254(d)

16  exceptions and also must also affirmatively establish the constitutional invalidity of his custody

17  under pre-AEDPA standards.  Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008) (en banc).  There is

18  no single prescribed order in which these two inquiries must be conducted.  Id. at 736-37.  The

19  AEDPA does not require the federal habeas court to adopt any one methodology.  Lockyer v.

20  Andrade, 538 U.S. 63, 71 (2003).

21                                         DISCUSSION

22      I.      Claim One

23         Petitioner alleges that the admission of evidence gathered from a foreign cyber

24  investigation, presented through the testimony of ICE special agent James Ponder, violated his

25  Sixth Amendment right to confrontation.  This issue was exhausted on direct appeal.

26          A.  Facts

27         Petitioner moved to exclude evidence of his internet use, and sought a hearing on

28  admissibility under Cal. Evid. Code section 402.  CT 142-143.  At hearing on motions in limine,

1   the arguments focused on the adequacy of discovery, relevance, and the foundation *vel non* for

2   Agent Ponder's proposed testimony.  RT 18-24.  At the section 402 hearing, RT 249-281, the

3   prosecutor produced for the first time a document showing the dates on which petitioner's credit

4   cards had been used to pay for access to Russian websites that contained pictures of naked

5   children.  The information in the document had been derived from server images provided to the

6   Cyber Crime Center by Russian law enforcement.  The method by which the document was

7   generated was not discussed.  As Agent Ponder subsequently testified before the jury, the

8   information linking petitioner's name, home address, email addresses and credit card numbers to

9   the websites all came from server data that had been seized by Russian authorities.  Agent Ponder

10  had not extracted any data from the servers himself, conducted the forensic examination, or

11  prepared the report about which he testified.

12                       B.  The Clearly Established Federal Law

13          The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall

14  enjoy the right to . . . be confronted with the witnesses against him."  The Confrontation Clause

15  prohibits the admission of testimonial out-of-court statements by non-testifying individuals.

16  Crawford v. Washington, 541 U.S. 36 (2004).  When the prosecution introduces a forensic report

17  that constitutes a testimonial statement, the analyst who produced the report must personally

18  testify.  Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311 (2009); Bullcoming v. New

19  Mexico, 131 S. Ct. 2705, 2710 (2011).  Confrontation Clause violations are subject to harmless

20  error analysis under Chapman v. California, 386 U.S. 18 (1967).  Delaware v. Van Arsdall, 475

21  U.S. 673, 684 (1986).

22                       C.  The State Court's Ruling

23          This court must review the decision of the California Court of Appeal, which was the last

24  reasoned state court judgment addressing this claim.  See Ylst v. Nunnemaker, 501 U.S. 797, 803

25  (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later

26  unexplained orders upholding that judgment or rejecting the same claim rest upon the same

27  ground.").  Where, as here, the state court's adjudication is set forth in a reasoned opinion,

28  §2254(d)(1) review is confined to "the state court's *actual* reasoning" and "*actual* analysis."

                                              8

1    <u>Frantz v. Hazey</u>, 533 F.3d at 738 (emphasis in original).

2         The appellate court analyzed the issue as follows:

3              Abel contends the trial court erred in multiple ways in admitting
              Ponder's testimony about Abel's accessing child pornography Web
4              sites. [Footnote omitted.] He argues this evidence was not timely
              disclosed to the defense, lacked foundation, was improper character
5              evidence, and was hearsay, the admission of which violated his
              Sixth Amendment confrontation rights. He further maintains that
6              even if the evidence was properly admitted, it was more prejudicial
              than probative and should have been excluded under Evidence
7              Code section 352.

8              The Attorney General concedes the prosecution failed to lay a
              sufficient foundation for admission of the evidence and therefore it
9              was erroneously admitted. We agree. Accordingly, we do not
              address Abel's other arguments in connection with this evidence,
10             and address only the consequences of its erroneous admission.

11             Abel maintains the error in admitting the evidence was of
              constitutional dimension under <u>Crawford v. Washington</u> (2004) 541
12             U.S. 36 (<u>Crawford</u>), requiring application of the <u>Chapman</u> prejudice
              standard. He asserts the computer printout about which Ponder
13             testified, showing the date and time Abel accessed a child
              pornography Web site, was hearsay, and he thus was denied his
14             constitutional right to confront and cross-examine witnesses against
              him.
15
              The Attorney General argues the computer data as to which Ponder
16             testified was not hearsay under <u>People v. Hawkins</u> (2002) 98
              Cal.App.4th 1428. Accordingly, the Attorney General maintains
17             <u>Crawford</u> does not apply and review is pursuant to the <u>Watson</u>
              prejudice standard.
18
              [. . .]
19
              Due to the lack of foundational information provided by the
20             prosecution it is impossible to determine whether the computer
              information to which Ponder testified is or is not hearsay – that is,
21             whether the information was a specially prepared compilation of
              data gleaned through forensic analysis or was simply a computer
22             printout of computer generated data -- let alone whether the
              computer was operating properly both at the time the information
23             was recorded or generated and the time it was extracted. We
              therefore do not decide whether there was <u>Crawford</u> error. (<u>People</u>
24             <u>v. Jenkins</u> (2000) 22 Cal.4th 900, 1015-1016 [finding it
              unnecessary to examine "the complex constitutional question"
25             because there was harmless error].) Instead, we conclude that even
              under <u>Chapman</u>, the admission of Ponder's testimony did not
26             constitute prejudicial error. (See <u>People v. Mitchell</u> (2005) 131
              Cal.App.4th 1210, 1225 ["A violation of the confrontation clause is
27             subject to harmless-error analysis."].)

28

                                          9

Under the Chapman standard, "'''we must determine on the basis of 'our own reading of the record and on what seems to us to have been the probable impact . . . on the minds of the average jury,' [citation], whether [the evidence was] sufficiently prejudicial to [defendant] as to require reversal." [Citations.]'" (People v. Houston (2005) 130 Cal.App.4th 279, 295-296, quoting People v. Anderson (1987) 43 Cal.3d 1104, 1128.)   "The harmless error inquiry asks: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' [Citation.]" (People v. Geier (2007) 41 Cal.4th 555, 608, abrogated on other grounds as noted in People v. Lopez (2009) 177 Cal.App.4th 202.)   "The admission of cumulative evidence, particularly evidence that is tangentially relevant to establishing a defendant's guilt, has been found to be harmless error.  [Citation.] Even when confessions are involved, 'if the properly admitted evidence is overwhelming and the . . . extrajudicial statement is merely cumulative of other direct evidence, the error will be deemed harmless.'" (People v. Houston, supra, 130 Cal.App.4th at p. 296, quoting People v. Anderson, supra, 43 Cal.3d at p. 1129.)

The evidence of Abel's access to child pornography sites was tangential to the charged crimes since Abel was not charged with possession of child pornography.  Rather, the evidence was offered to corroborate J.A.'s testimony that Abel showed him pictures of nude boys on the computer while he molested him.  Accordingly, the evidence was "'merely cumulative of other direct evidence.'" (People v. Houston, supra, 130 Cal.App.4th at p. 296.)

Our review of the record also establishes the evidence of Abel's guilt was overwhelming.  Both children's uncontradicted testimony established Abel's guilt.  Indeed, Abel concedes "the complaining witnesses, and in particular, [J.A.], described instances that standing alon[e] would be sufficient to convict of molestation . . . ."  E.A. testified regarding two specific instances of Abel touching her vagina.  Though her description of events changed somewhat from her first and second police interviews to her trial testimony five years later, it was consistent in all material respects.  Notably, as Abel concedes, E.A. testified consistently about Abel molesting her on a chair at a time when they made cookies together.  She also consistently denied ever touching Abel's penis despite his invitation to do so.  Likewise, J.A.'s testimony included the same details he gave in police interviews, including that Abel took photographs of him, used a digital camera, and put the photos on his computer.  In addition to being consistent, this testimony was not the type of information a child would be expected to know absent actual experience, giving J.A.'s testimony increased indicia of reliability. There also was evidence of Abel's own consciousness of guilt. Abel was told about E.A.'s allegations prior to officers obtaining a search warrant.  When police executed the warrant, his desktop computer was missing and the hard drive had been removed from his laptop.  As Ponder testified, the child pornographic images Abel viewed "would have been on [Abel's] hard drive."

Abel argues the evidence, while "sufficient to convict," was not overwhelming.  He asserts the children were asked "leading"

10

questions in their initial interviews and complains their memories improved over time. He asserts Mother was biased against him and feared losing custody of the children because of "apparent" parenting deficiencies. [Footnote omitted.] Finally, he argues there was no medical examination of E.A., nor a forensic examination of a computer Abel gave to J.A. Even assuming the truth of these contentions, the evidence Abel committed the crimes against his children was overwhelming.

We thus conclude Ponder's testimony concerning dates Abel accessed child pornography Web sites, as shown on the computer printout, was harmless beyond a reasonable doubt.

### D. Objective Reasonableness Under § 2254(d)

Petitioner contends that AEDPA standards do not apply to this claim, because the state court "explicitly refused to decide whether admission of Ponder's testimony violated the constitution." ECF No. 1 at 27. This argument must be rejected. AEDPA standards apply to any claim "adjudicated on the merits" by a state court. § 2254(d). Rejection of a constitutional claim on harmless error grounds is a merits adjudication that is subject to § 2254(d). Mitchell v. Esparza, 540 U.S. 12, 17-18 (2003) (per curiam); see also, e.g., Greenway v. Schriro, 653 F.3d 790, 805-06 (9th Cir 2011) (finding state court's harmless error ruling contrary to federal law under § 2254(d)(1)); Inthavong v. Lamarque, 420 F.3d 1055, 1058-59 (9th Cir. 2005) (finding state court's harmless error analysis reasonable under § 2254(d)(1)), cert. denied, 547 U.S. 1059 (2006). Here, the state court determined that it did not need to reach the question whether there had been Crawford error, because any such error would be harmless even under the standard applicable to constitutional violations. The question before this court is whether that analysis was objectively unreasonable. Frye v. Pliler, 551 U.S.112, 119 (2007) (Mitchell holds that when a state court finds a constitutional error harmless, the federal habeas court must determine whether "*the harmlessness determination itself*" was unreasonable under AEDPA (emphasis in original)).

The state court's decision to conduct harmless error analysis was entirely consistent with federal law. See Van Arsdall, 475 U.S. at 684 (Confrontation Clause violations are subject to harmless error analysis). Accordingly, regardless of the egregiousness of the confrontation violation viewed in isolation (and the error in admitting this testimony was patent), habeas relief is available only if the state court's harmless error analysis was contrary to or an unreasonable

1   application of clearly established federal law.

2          The state court applied the correct standard: harmlessness beyond a reasonable doubt

3   pursuant to Chapman.  See Van Arsdall, 475 U.S. at 684 (Chapman standard applies).

4   Accordingly, the state court adjudication was not contrary to federal law.

5          Neither was the harmless error analysis objectively unreasonable.  The state court was

6   correct that the case against petitioner was based squarely on the children's testimony that

7   petitioner had sexually abused them.  Petitioner's computer use was a side issue, and the evidence

8   related to computer images was not offered or argued to prove any element of the charged

9   offenses.  Agent Ponder's testimony was offered to support J.A.'s credibility, by corroborating his

10  testimony that his father had shown him pictures of naked boys on the computer.  J.A.'s

11  testimony in this regard was perfectly proper, as those images were directly involved in some of

12  the acts of molestation that J.A. recounted.  Moreover, J.A.'s testimony regarding computer

13  images was independently (albeit indirectly) corroborated by the testimony of Detective

14  Donaldson and photos of petitioner's living room computer desk, which supported an inference

15  that petitioner had cleaned out evidence of his online activities once he knew that J.A. had talked

16  to the police.[1]  The state court's characterization of Ponder's testimony as cumulative

17  corroboration was not unreasonable.

18         Ponder's testimony did not introduce facts not otherwise known to the jury that could

19  have affected the verdict.[2]  Nor was his testimony inflammatory.  The judge had specifically ruled

20  that Ponder could not use the word "pornography" or the phrase "child pornography" because of

21  the potential for prejudice.  RT 275, 280.  The witness abided by this ruling.[3]  Ponder's testimony,

22  like that of J.A., simply referred to images of naked children.  Ponder did not suggest that

23

24  [1] Petitioner urged a different inference, namely that petitioner had had plugged in his laptop rather than a desktop unit and monitor at the desk.  This court must assume that the jury drew all inferences in favor of the prosecution.  Moreover, even if petitioner had offered evidence to

25  support his argument about the computer desk (which he did not), the fact that the laptop was missing a hard drive independently supports an inference that petitioner destroyed evidence or

26  was trying to hide his online activities.

27  [2] The fact that petitioner was a paying customer of websites based in Russia was insignificant.
    [3] The lawyers did use the words "pornography" and "porn" in their closing arguments.  RT 478-

28  79, 480 (prosecution), RT 510 (defense), RT 512, 521-22 (prosecution rebuttal).

1  petitioner had accessed or viewed pictures of children engaging in sex acts.  Petitioner identifies

2  no salacious or inflammatory content in Ponder's testimony, and the undersigned finds none.

3       Petitioner argues that the centrality of Ponder's testimony is established by the fact that

4  the original criminal charges were dismissed when the prosecutor was unable to obtain forensic

5  computer evidence, and that petitioner was later tried when such evidence was available.  The

6  prior dismissal is an interesting bit of procedural history, to be sure, but it has no bearing on the

7  prejudice analysis that is required here.  The question is whether the improper evidence affected

8  the jury's verdict.  Chapman, 386 U.S. at 23.  The jury's verdict cannot have been affected by

9  procedural history they did not know about.  The effect of constitutional error is evaluated in light

10  of the evidence presented at trial, considered as a whole.  Mata v. Ricketts, 981 F.2d 397, 398

11  (9th Cir. 1992) (per curiam), cert. denied, 513 U.S. 968 (1994).  The trial record in this case does

12  not support petitioner's characterization of the Ponder hearsay as central to the government's

13  case.  Every element of the charges was proven independently of the Russian cyber investigation.

14       The prosecutor did not rest any part of her case on Agent Ponder's testimony, although

15  she did refer to it in closing argument.  After arguing that Detective Donaldson's testimony

16  corroborated J.A.'s reports of computer use, the prosecutor also said, "[T]his man was looking at

17  kiddie porn.  I mean that's the bottom line, he was looking at child pornography.  And you know

18  that because you had Agent Ponder come in and tell you..."  RT 478-79.  Shortly thereafter she

19  stated, "Not only does [the Russian website evidence] show [petitioner's] interest in kids, but it

20  also corroborates what [J.A.] said."  RT 480.[4]  Petitioner takes these brief comments out of

21  context to suggest that the Russian website evidence was the "bottom line" of the case, and that

22  the prosecutor urged the jury to convict on its basis.  Review of the entire closing argument does

23  not support this characterization.  The vast majority of the prosecutor's argument, like the vast

24  majority of the evidence, involved the children's direct accounts of their father's abuse.

25  _____

26  [4] A similar comment was made in rebuttal.  RT 522 (petitioner used credit card "to access kiddie
porn because that's what he likes, he likes boys.")  These comments regarding petitioner's

27  penchant for boys may well have improperly hinted at a propensity theory.  The references were
brief, however, and did not render the trial fundamentally unfair.  These few lines in a lengthy

28  summation do not render the state court's harmlessness finding objectively unreasonable.

1    Petitioner contends that the case against him was weak, which made the erroneous

2    admission of the Ponder hearsay more likely to be prejudicial.  The case was not weak.  Like all

3    cases that turn on witness credibility, it was certainly a case subject to challenge.  The children's

4    credibility was challenged.  The defense highlighted the inconsistencies in the various statements

5    the children had made over time, presented expert testimony in support of the theory that the

6    children had responded to suggestive questioning, and presented witnesses who testified that

7    petitioner's had a good relationship with his children and that they had not acted afraid of him

8    during the years in question.  The jury believed the children despite the defense challenge to their

9    credibility.  As the prosecution argued and the state court reasonably found, the children's

10   statements had been consistent over time about the most important facts.  The jurors were in the

11   best position to evaluate their demeanor on the witness stand and on the videotapes, and that

12   assessment is entitled to deference here.  See Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004)

13   (stating that jury's credibility determinations are entitled to "near-total deference").  Because

14   nothing in the Ponder hearsay testimony materially alters the balance of the credibility evidence

15   that the jury weighed, the state court reasonably found that its admission was harmless beyond a

16   reasonable doubt.

17          For all these reasons, the state court's application of the Chapman standard was not

18   objectively unreasonable and § 2254(d) therefore precludes relief on this claim.

19          II.    Claim Two

20          Petitioner alleges that the trial court's refusal to rule on the admissibility of Ponder's

21   testimony prior to jury selection, so that voir dire could address biases related to child

22   pornography, (a) violated petitioner's right to an impartial jury and (b) deprived him of the

23   effective assistance of counsel.  These issues were presented to the state supreme court in the

24   2011 state habeas petition.

25          A.    Facts

26          At initial argument on the motion to exclude Ponder's testimony, defense counsel urged

27   the court to conduct the 402 hearing prior to jury selection so that counsel could conduct voir dire

28   with the knowledge of what evidence would be presented.  RT 23 (". . . I think the jury would

14

1   need to be properly voir dired with this information if it's going to be admitted or it's not.  I think

2   that would change the scope and direction of voir dire and change who we get on this jury.").

3   The judge asked for "an example of what you would ask the jury."  Id.  Counsel replied, "I would

4   probably ask them what their thoughts are on child pornography on the internet and how they

5   may feel or what type of thoughts they would have if they learned that a witness in this case did

6   that."  Id. at 23-24.  The judge indicated that such questions would be argumentative and invite

7   prejudgment.  She reserved ruling on the admissibility of the testimony pending a 402 hearing,

8   which took place during a break in the prosecution's case in chief.

9                        B.  The Clearly Established Federal Law

10          The constitutional guarantee of a fair trial encompasses the right to an impartial jury.  See

11   Morgan v. Illinois, 504 U.S. 719, 727 (1992); Groppi v. Wisconsin, 400 U.S. 505, 508 (1971).

12   Part of the guarantee of an impartial jury is "an adequate voir dire to identify unqualified jurors."

13   Morgan, 504 U.S. at 729.  The content and conduct of questioning generally fall within the

14   discretion of the trial court.  Id.  To be constitutionally compelled, particular voir dire questions

15   must be necessary to the fundamental fairness of the trial.  Mu'Min v. Virginia, 500 U.S. 415,

16   425-26 (1991).  The Fourteenth Amendment therefore requires a trial court to question

17   prospective jurors on the issue of racial prejudice when the facts indicate that race is likely to be

18   an issue in the case.  Ham v. South Carolina, 409 U.S. 524 (1972);[5] see also Ristaino v. Ross, 424

19   U.S. 589 (1976) (limiting application of Ham, and holding that state court judges are not

20   constitutionally inquired to ask about race in every case where the races of defendant and victim

21   differ).

22                        C.  The State Court's Ruling

23          The California Supreme Court denied the state habeas petition in a so-called "postcard

24   denial," without stated reasons or citation to authority.  Lodged Doc. I (order stating in full, "The

25   petition for writ of habeas corpus is denied.")  This constitutes a decision on the merits for

26

27   [5] Ham involved the prosecution of an African-American civil rights activist for marijuana
    possession.  The defendant contended that he had been framed in retaliation for his activism on
28   racial issues.

1   purposes of AEDPA.  Harrington v. Richter, 131 S. Ct. at 784-785.  Under California law, a

2   summary denial means that the court assumed the truth of all factual allegations asserted in

3   support of the claim, and nonetheless concluded that those facts did not state a claim entitling the

4   petitioner to relief.  People v. Duvall, 9 Cal. 4th 464, 474 (1995); People v. Romero, 8 Cal. 4th

5   728, 737 (1994).  In other words, summary denial on the merits indicates a determination that the

6   petitioner has failed to state a prima facie case.  Duvall, 9 Cal. 4th at 475; Cullen v. Pinholster,

7   131 S. Ct. at 1402 n.12 (citing In re Clark, 5 Cal. 4th 750, 770 (1993)).  When a state court denies

8   a claim for failing to state a prima facie case, the absence of a prima facie case is the

9   determination that must be reviewed for reasonableness under § 2254(d).  Nunes, 350 F.3d at

10   1054-55.

11                 D.  Objective Reasonableness Under § 2254(d)

12                     1.  Right to Voir Dire

13              The California Supreme Court did not unreasonably reject this claim, because no clearly

14   established federal law recognizes a right to question prospective jurors on voir dire regarding

15   case-specific evidentiary matters.  In the absence of such authority, the state court reasonably

16   concluded that petitioner failed to state a constitutional claim that could entitle him to relief.

17              The Supreme Court has never recognized a constitutional right to question prospective

18   jurors regarding particular types of evidence or the specific facts of the case.  A right to make

19   make particular inquiries on voir dire has been recognized only in the context of race, and only

20   when there is a specific risk of racial animus infecting the jury as in Ham, supra.  The high Court

21   has not extended Ham beyond the race context.  Accordingly, the state court's failure to extend

22   Ham to this case cannot constitute an unreasonable application of federal law.  See Kemp v.

23   Ryan, 638 F.3d 1245, 1262 (9th Cir.) (because Ham does not extend to voir dire on attitudes

24   regarding sexual orientation, no clearly established federal law governs the claim and AEDPA

25   precludes relief), cert. denied, 132 S. Ct. 553 (2011).

26              In addition to Ham, petitioner relies on Morford v. United States, 339 U.S. 258 (1950).  In

27   Morford the Supreme Court summarily reversed the defendant's conviction for failing to produce

28   documents to the House Un-American Activities Committee, because the defense had not been

16

1   permitted to question prospective government employee jurors about the possible influence of the

2   "Loyalty Order" on their ability to be impartial.[6]  Morford did not, as petitioner suggests,

3   establish a constitutional right to voir dire regarding anti-communism or other political prejudices

4   in cases with political overtones.  Moreover, cases involving the conduct of federal trials are

5   inapposite in the habeas context.  See Mu'Min, 500 U.S. at 422 (distinguishing between the

6   Supreme Court's voir dire precedents on appeal from federal convictions and on habeas review of

7   state convictions).

8          For the same reason, petitioner relies in vain on various opinions of the circuit courts of

9   appeals which have approved broader voir dire in certain federal criminal trials than is

10  constitutionally required by Ham.  See ECF No. 1 at 49-50.[7]  Furthermore, intermediate appellate

11  decisions do not constitute clearly established federal law for purposes of AEDPA review.  See

12  Ortiz-Sandoval v. Clarke, 323 F.3d 1165, 1172 (9th Cir. 2003).  Even if the cited cases involved

13  the constitutional obligations of the state courts, which they do not, they would not support relief

14  in this AEDPA case.

15         Voir dire regarding online child pornography was not necessary to the fundamental

16  fairness of petitioner's trial.  See, Mu'Min, 500 U.S. at 425-26.  This was not a pornography

17  prosecution.  The issue was child sexual abuse, and the challenge for jury selection – always

18  formidable in such cases – was the identification and removal of jurors who could not remain

19  impartial due to the nature of the charges.  Pornography was a secondary issue.  Because the

20  evidence of online images was limited both in scope and in importance, fundamental fairness did

21  not require the inquiry petitioner urges.  Moreover, the jurors were going to learn that petitioner

22  had images of naked boys on his computer whether or not Agent Ponder testified.  And because

23  Ponder was prohibited from characterizing the Russian websites as pornographic, his testimony

24  did not inject additional inflammatory subject matter that would have changed the scope of voir

25

26  [6] The "Loyalty Order," Executive Order No. 9835, was signed by President Truman in 1947.  It
    authorized departmental loyalty boards to screen federal employees and job applicants, and
27  permitted FBI investigation of employees under suspicion of holding subversive views.
    [7] Citations to court documents refer to the page numbers assigned by the court's electronic
28  docketing system and not those assigned by the parties.

1   dire necessary to identify jurors who could not be impartial.  Accordingly, the trial judge's

2   decision to hold the admissibility hearing after jury selection cannot have affected the fairness of

3   jury selection or the impartiality of the jury.

4         In sum, because no clearly established Supreme Court precedent required the trial judge in

5   this case to permit voir dire related to the substance of Agent Ponder's testimony, this claim was

6   not unreasonably rejected by the California Supreme Court for failure to state a claim.

7                    *2.   Effective Assistance of Counsel*

8         Petitioner claims that the trial court's refusal to rule on the admissibility of Ponder's

9   testimony prior to jury selection violated his right to the effective assistance of counsel.  The

10  Sixth Amendment guarantees criminal defendants the right to counsel at all critical stages of the

11  proceedings.  Coleman v. Alabama, 399 U.S. 1, 9-10 (1970).  Petitioner was represented by

12  counsel both during jury selection and during the 402 hearing; he was not denied the assistance of

13  counsel at any critical stage of the proceeding.  Neither does he point to deficient performance by

14  his counsel within the meaning of Strickland v. Washington, 466 U.S. 668 (1984).  Rather,

15  petitioner here invokes his right to the effective assistance of counsel as a variation of his claim

16  that he was unable to conduct adequate voir dire.  Because petitioner had no right to the voir dire

17  at issue, the claim must fail.

18        Petitioner relies on a line of Supreme Court cases in which state interference with a

19  defendant's access to his lawyer or the lawyer's ability to perform her role was held to violate the

20  Sixth Amendment.  Geders v. United States, 425 U.S. 80 (1980), held that the right to assistance

21  of counsel was violated when the trial judge refused to allow any communication between

22  defendant and his lawyer during an overnight recess during trial.  This was a complete denial of

23  access to counsel, and inapposite to the present case.  Herring v. New York, 422 U.S. 853 (1975),

24  held that the right to assistance of counsel was violated when the judge refused to permit defense

25  summation in a bench trial.  Counsel was entirely precluded from performing an essential

26  advocacy function, unlike in the present case.  In Brooks v. Tennessee, 406 U.S. 605 (1972), the

27  trial court refused to permit the defendant to testify because he would not agree to testify before

28  all the other defense witnesses.  This was held to violate the defendant's right to make a free

1    choice whether or not to testify, a choice implicating the Fifth Amendment privilege.  Brooks,

2    406 U.S. at 609.  The Court noted that the defendant was also precluded from consulting with his

3    lawyer about the strength of the defense case and the tactical decision whether to testify, in

4    violation of the Sixth Amendment.  Id.  Brooks does not apply to the present case.  Petitioner was

5    not prevented from making counseled choices about his tactical options.

6         Petitioner has identified no Supreme Court precedent that supports a finding that his right

7    to counsel was infringed by the timing of the 402 hearing or the scope of voir dire.  The

8    intermediate court of appeals cases that petitioner cites do not constitute clearly established

9    federal law for AEDPA purposes.  Because there is no clearly-established legal basis for the

10   claim, the California Supreme Court's summary denial cannot have been unreasonable and §

11   2254(d) precludes relief.

12        CONCLUSION

13        For all the reasons explained above, the state court's adjudication of petitioner's claims

14   was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Accordingly, IT IS

15   RECOMMENDED that the petition for writ of habeas corpus be denied.

16        These findings and recommendations are submitted to the United States District Judge

17   assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days

18   after being served with these findings and recommendations, any party may file written

19   objections with the court and serve a copy on all parties.  Such a document should be captioned

20   "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

21   he shall also address whether a certificate of appealability should issue and, if so, why and as to

22   which issues.  See 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed

23   within fourteen days after service of the objections.  The parties are advised that failure to file

24   ////

25   ////

26   ////

27   ////

28   ////

1   objections within the specified time may waive the right to appeal the District Court's order.

2   Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3   DATED: November 8, 2013

4

5                                          ALLISON CLAIRE

6                                          UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28